GEORGE K. JAWLAKIAN (SBN 296692)
JAWLAKIAN LAW GROUP APC
16130 VENTURA BOULEVARD, SUITE 500
ENCINO, CA 91436
TELEPHONE: 213-805-6500
FACSIMLE: 844-633-2467
Attorney for Plaintiffs
CA SMOKE & VAPE ASSOCIATION, INC., d/b/a CARR
ACE SMOKE SHOP

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CA SMOKE & VAPE ASSOCIATION, INC., D/B/A CARR, and ACE SMOKE SHOP,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF LOS ANGELES, and HILDA L. SOLIS, MARK RIDLEY-THOMAS, SHEILA KUEHL, JANICE HAHN, and KATHRYN BARGER, EACH IN HIS OR HER OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF SUPERVISORS,<br><br>Defendants. | Case No.: 2:20-cv-4065<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

Plaintiffs, CA SMOKE & VAPE ASSOCIATION, INC., D/B/A CARR ("CARR"), and one of its members, ACE SMOKE SHOP, a partnership, ("ACE" together with CARR, collectively, "Plaintiffs"), by and through their undersigned counsel, submit this Complaint for Declaratory Judgment and Injunctive relief against Defendants – County of Los Angeles, The Board of Supervisors of the County of Los Angeles, ("the Board") and the individual members of the Board of Supervisors, each in his or her official capacity (all Defendants collectively referred to as "LA County") – and allege as follows:

## INTRODUCTION

1.      Plaintiffs, seek to enjoin the County of Los Angeles from enforcing its recently enacted ordinance, amending and adding various sections to Title 7 – Business Licenses, and Title 11 – Health and Safety, of the Los Angeles County Code (the "Ordinance," attached hereto as Exhibit 1), requiring businesses to obtain two additional licenses, imposing tobacco product standards, and prohibiting the sale of and the possession with intent to sell "flavored tobacco products," including menthol, within the County of Los Angeles. *Id*.  The great majority of vapor products and devices sold in LA County would be prohibited under this Ordinance. Nader Decl. ¶¶ 9-10.[1]

---

[1] The declarations of Nader Farargi ("Nader Decl."), Samir Elmoghrabi ("Samir Decl."), Jacob Grair ("Jacob Decl."), and John Dunham ("Dunham Decl.") are filed concurrently with Plaintiff's Complaint.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

2.  LA County claims the purpose of the Ordinance is to curb tobacco use amongst minors and to protect the public health from vaping illnesses. Yet the Ordinance exempts vaping products that contain tetrahydrocannabinol ("THC"), which, according to the Food and Drug Association ("FDA"), is the primary source linked to the outbreak of recent illnesses.[2] Similarly, the Ordinance makes no distinction between the black-market vaping products at the center of that outbreak, and the FDA regulated products produced by legitimate manufacturers.[3] Instead, the Ordinance implements a blanket prohibition on the sale of flavored tobacco products to all persons, threatening to destroy an entire industry and the livelihoods of Los Angeles County residents.

3.  The Ordinance defines "characterizing flavor" as "a taste or aroma, other than the taste or aroma of tobacco, imparted either prior to or during consumption of a tobacco product or any byproduct produced by the tobacco product, including, but not limited to, tastes or aromas relating to menthol, mint, wintergreen, fruit, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, herb, or spice. Characterizing flavor includes flavor in any form, mixed

---

[2] FDA, *Lung Illnesses Associated with Use of Vaping Products* (revised April. 13, 2020), https://www.fda.gov/news-events/public-health-focus/lung-illnesses-associated-use-vaping-products.

[3] Lena Sun, *What we know about mysterious vaping linked illnesses*, The Washington Post (January 10, 2020), *available at* <https://www.washingtonpost.com/health/2019/09/07/what-we-know-about-mysterious-vaping-linked-illnesses-deaths/>.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

with or otherwise added to any tobacco product or nicotine delivery device, including electronic smoking devices." Gov. Code, § 11.35.020(c).

4. Plaintiffs seek relief on the grounds that the federal statutory law preempts the Ordinance under the Supremacy Clause of the United States Constitution.

5. Plaintiffs also seek relief on the grounds that the Ordinance is invalid under the Fourteenth Amendment of the Constitution.

6. Plaintiffs will be irreparably harmed by the Ordinance's imminent enforcement, as they will be forced to shut down their business operations entirely.

7. The Ordinance will destroy Los Angeles County's 48 million dollar nicotine vapor product industry, and damage the livelihoods of the 450 workers that it employs.

8. The Ordinance will likely precipitate a public-health crisis, as vapor-products users turn either to combustible cigarettes or to black-market sources to obtain vapor products.

9. The balance of the equities favors Plaintiffs, as they merely seek to preserve the status quo while Defendants pursue stricter regulation of "flavored" tobacco products.

//

//

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

**JURISDICTION AND VENUE**

10.     This action arises under and pursuant to the Constitution of the United States, including the Supremacy Clause, U.S. Const., art. VI, § 3; U.S. Const., art. XIV § 1; and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988.

11.     Because this Action arises under the Constitution and laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

12.     This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     Venue for this Complaint is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because the events giving rise to the suit occurred in this District, the Defendants reside in this District, the Defendants adopted Los Angeles County Code sections 7.83 and 11.35 in this District, and Defendants seek to enforce sections 7.83 and 11.35 against Plaintiffs in this District.

**PARTIES**

14.     CARR is a local non-profit industry trade association, comprised of wholesalers, manufacturers of nicotine-containing flavored e-liquids, and primarily brick-and-mortar retailers. CARR has members located in the County of Los Angeles, that are subject to the recently enacted Ordinance, and sell, *inter alia*, nicotine products containing flavored e-liquids, and other tobacco products. The great majority of Los Angeles County CARR members have an inventory

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

composition of approximately 90% to 95% in flavored tobacco products. Nader Decl. ¶¶ 9-10.

15.     ACE SMOKE SHOP ("ACE"), a partnership. is a CARR member. Prior to the Ordinance's enactment, ACE operated a successful vapor-products retail store in Los Angeles County, California. ACE and its employees now face financial ruin as a result of the Ordinance. Jacob Decl. ¶ 15.

16.     Defendant County of Los Angeles is a public entity constituted under the Constitution and the laws of the State of California.

17.     Defendant Board of Supervisors is the duly elected governing body of Defendant County of Los Angeles.

18.     Defendants Hilda L. Solis, Mark Ridley-Thomas, Sheila Kuehl, Janice Hahn, and Kathryn Barger, are the duly elected members of the Board of Supervisors, and each is sued in his or her official capacity as a member of the Board of Supervisors and not individually.

## FACTUAL BACKGROUND

## I.     Flavored Vapor Products, Widely Used by Former Smokers, Are a Less Harmful Alternative to Combustible Cigarettes

19.     In recent years, many lifetime smokers have used the assistance of vapor products to reduce or permanently stop using combustible cigarettes. Jacob Decl. ¶ 7. Vapor products, also known as "electronic cigarettes," "e-cigarettes," or

"electronic nicotine delivery systems (ENDS)," are handheld electronic devices that are used in conjunction with or contain flavored e-liquid. Nader Decl. ¶ 5. The majority of vapor products and devises sold in LA County would be considered "flavored tobacco products" and prohibited under this Ordinance. Nader Decl. ¶ 10.

20.     A large and growing body of scientific evidence indicates that ENDS products, while not completely harmless, do not pose the same harms and health risks, and are substantially less harmful, than traditional combustible tobacco products. This is due in part to the fact that the e-liquid used in ENDS products do not contain tobacco and do not result in a combustion process which produces smoke and numerous harmful by-products, like the emission of particulate matter such as tar, carbon monoxide, and many other harmful substances.[4]

21.     Moreover, there is considerable evidence that the overwhelming majority ENDS products consumers, are now former cigarette smokers who have turned to ENDS products as a smoke-free alternative to reduce or outright quit smoking, and to avoid the significant health hazards associated with combustible tobacco products.[5]

---

[4] Linda Bauld, *The evidence keeps piling up: e-cigarettes are definitely safer than smoking*, The Guardian (December 29, 2017), <https://www.theguardian.com/science/sifting-the-evidence/2017/dec/29/e-cigarettes-vaping-safer-than-smoking> (accessed April 20, 2020).
[5] Paul Blair, *New CDC Data, More Than 9 Million Adults Vape Regularly in the United States,* (November 9, 2015), < https://www.atr.org/new-cdc-data-more-9-million-adults-vape-regularly-united-states> (accessed April 20, 2020).

22.     Commissioned by the Food and Drug Administration ("FDA"), The National Academies of Sciences, Engineering and Medicine completed an exhaustive peer-reviewed literature and found that: "across a range of studies and outcomes, e-cigarettes pose less risk to an individual than combustible tobacco cigarettes," including conclusive evidence that substituting such products for combustible cigarettes "reduces users' exposure to numerous toxicants and carcinogens" and substantial evidence that switching results in reduced short-term adverse health outcomes in several organ systems.[6]

23.     Mitchell Zeller, the Director of the Center for Tobacco Products at the FDA, recently acknowledged in sworn testimony in a federal court proceeding that some ENDS products may reduce harm and help some addicted smokers end combustible tobacco use. Director Zeller further noted in his sworn testimony that "[d]ramatically and precipitously reducing availability of [vapor] products" in the fashion embodied in the Ordinance "could present a serious risk that adults, especially former smokers, who currently use [ENDS] products and are addicted to nicotine would migrate to combustible tobacco products."[7]

---

[6] Kathleen Stratton et al., *Public Health Consequences of E-Cigarettes*, Nat'l Acad. Sci., Eng'r & Med. 12 (2018), *available at* https://www.ncbi.nlm.nih.gov/books/NBK507171/pdf/Bookshelf_NBK507171.pdf.
[7] Declaration of Mitchell Zeller, American Academy of Pediatrics v Food and Drug Admin, No 8:18-cv-00883-PWG (D. Md. 2019) at 115.

24.     Public health authorities around the world have come to similar conclusions. The United Kingdom's Royal College of Physicians has concluded that the potential hazard to health arising from long-term use of vapor products is, at most, five percent (5%) of the comparable harm resulting from the use of traditional combustible cigarettes.[8]

25.     The impact of the availability of a wide variety of vapor products, including non-tobacco and non-menthol flavored e-liquids, on consumer demand for traditional combustible cigarettes has been significant. Flavored nicotine vapor products are widely used by adults. For example, a cross-sectional study of current or former adult smokers in the United States who used e-cigarettes found that that 82.8 percent used flavored nicotine vaping products, while only 17.2 percent used tobacco-flavored nicotine vaping products.[9]

26.     Another study of American adults who frequently used e-cigarettes found that "[c]urrent e-cigarette use among participants was dominated by use of non-tobacco flavors, mainly fruit/fruit beverage, dessert/pastry, and/or candy/chocolate, sweet flavors."[10] The authors concluded that their findings

---

[8] Royal College of Physicians Tobacco Advisory Group, *Nicotine Without Smoke: Tobacco Harm Reduction* (April 28, 2016), <https://www.rcplondon.ac.uk/projects/outputs/nicotine-withoutsmoke-tobacco-harm-reduction-0> (accessed April 20, 2020).
[9] Paul T. Harrell et al. E-Cigarettes and Expectancies: *Why Do Some Users Keep Smoking?*, 110 Addiction 1833–43 (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4609252/pdf/nihms707991.pdf
[10] Christopher Russell et al., *Changing Patterns of First E-Cigarette Flavor Used and Current Flavors Used by 20,836 Adult Frequent E-Cigarette Users in the USA*, 15 Harm Reduction Journal 1–14 (2018).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

"suggest that access to a variety of non-tobacco flavored e-liquid may be important for encouraging and assisting adults to use e-cigarettes in place of conventional cigarettes."[11]

27.     Enforcement of the LA County Ordinance would ban all flavored vapor products and eliminate a viable method for longtime cigarette smokers to quit the use of combustible cigarettes.

## II.     Health Problems Erroneously Attributed to ENDS Products

28.     Prior to the summer of 2019, ENDS products had been available to United States consumers for approximately a decade. During the time, Plaintiffs assert that there were no reports of adverse health problems resulting from the use of ENDS products.

29.     Beginning in the summer of 2019, numerous media reports began circulating that individuals across the United States who vaped were suffering from severe pulmonary issues, colloquially termed as "vaping related" illnesses.

30.     While federal and state health officials initially cast blame upon ENDS products, subsequent investigation and testing of the suspected products used by these individuals revealed that the severe pulmonary issues were most likely caused by the illicit addition of THC.[12]

---

[11] *Id*.
[12] Michelle Minton, *Update: Big Picture in 'Vaping-Linked' Lung Poisonings, Competitive Enterprise Institute* (September 16, 2019), *available at* < https://cei.org/blog/update-big-picture-vaping-linked-lung-poisonings>.

31.     Neither THC nor marijuana is included as an ingredient of any ENDS product permitted for retail sale in the United States under federal law, nor is either included as an ingredient in any products sold by Plaintiffs. Nader Decl. ¶ 5.

32.     The illegal vapor cartridges that contain THC and/or marijuana have also been reported to contain significant amounts of vitamin E acetate, which is a diluting and thickening agent that makes cannabis oil more affordable.[13]

33.     According to the FDA, the primary cause of recent illnesses relating to vapor products has been attributed to the THC-containing products[14] Indeed, the majority of patients who have been monitored for vape related lung illnesses have disclosed that they exclusively consume vaping products containing THC."[15]

III.     **The Tobacco Industry is a Vital Part of the LA County Economy**

34.     The national vaping-products industry, which employs approximately 166,000 people, is a "dynamic part of the U.S. economy, accounting for $24.46 billion annually in economic output." Dunham Decl. ¶ 5. Of that, approximately $48 million is traceable to the unincorporated areas of Los Angeles County, where

---

[13] Lena Sun, *What we know about mysterious vaping linked illnesses*, The Washington Post (January 10, 2020), *available at* <https://www.washingtonpost.com/health/2019/09/07/what-we-know-about-mysterious-vaping-linked-illnesses-deaths>.
[14] FDA, *Lung Illnesses Associated with Use of Vaping Products* (revised April 13, 2020), <https://www.fda.gov/news-events/public-health-focus/lung-illnesses-associated-use-vaping-products>.
[15] *Id*.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

the vapor-products industry directly or indirectly employs just under 450 people. *Id.* at ¶ 11.

35.     The wages and benefits earned annually by those 450 employees total almost $7.3 million, and the direct economic output attributable to retail vape shops and vapor-liquid manufacturing exceeds $18 million. *Id.* at ¶ 13.

36.     The study conducted by John Dunham focused exclusively on small vapes shops that only sell e-liquid related products, and does not account for the economic loss that would be suffered by the 753 tobacco retailers within the unincorporated areas of LA County sell all tobacco products.[16]

**IV.     The Ordinance Prohibits the Sale of Flavored Tobacco Products**

37.     On September 24, 2019, the Los Angeles County Board of Supervisors enacted the Ordinance prohibiting the sale of all flavored tobacco products, imposing new tobacco product standards, and requiring retailers apply for and maintain two new business licenses.

38.     During the meeting, board members discussed the increased use of vaping products amongst individuals under the age of 21, and referenced citations

---

[16] California Department of Tax and Fee Administration, *California Cigarette & Tobacco Product Licenses*, (April 4, 2019) available at: <https://www.cdtfa.ca.gov/taxes-and-fees/cigarette-licensees.htm> accessed on (April 20, 2020).

to statistics on youth vaping according to the internal research of the Los Angeles County Department of Health.[17]

39.     The board also relied on a recently modified C.D.C. report detailing 540 cases of individuals experiencing sudden and severe lung illness associated with vaping.[18]

40.     During the same meeting, the board affirmatively stated that the Ordinance would not ban online sales of flavored tobacco.[19]

41.     However in its final draft, the Ordinance, the prescribed definitions contained therein, and the LA County Code in its entirety, do not specify whether enforcement of the Ordinance would be limited to in-person sales, and fail to specify whether online or out-of-state sales would be exempted from enforcement. As defined, various provisions of the Ordinance require tobacco retailers to maintain an active license regardless of whether the tobacco product sales are conducted in-person, online, or sold to out-of-state residents:

> "Tobacco Retailer" means any person who sells, offers for *sale or distribution*, exchanges, or offers to exchange for any form of consideration, tobacco, tobacco products, or tobacco paraphernalia *without regard to the quantity sold, distributed*, exchanged, or offered for exchange.

L.A. Cnty. Code § 11.35.020(V) (emphasis added).

> "Tobacco Retailing" means selling, offering for sale, exchanging, or offering to exchange for any form of consideration, tobacco, tobacco products, or

---

[17] *The Meeting Transcript of The Los Angeles County Board of Supervisors,* Pg. 81, ¶ 17 (September 24, 2019) *available at*
http://file.lacounty.gov/SDSInter/bos/sop/transcripts/1061879_092419.pdf
[18] *Id*. at 83.
[19] *Id*. at 80.

tobacco paraphernalia without regard to the quantity sold, offered for sale, exchanged, or offered for exchange.

L.A. Cnty. Code § 11.35.020(W).

In addition to the Tobacco Retail License, any Tobacco Shop in an unincorporated area of the County, devoted exclusively or predominantly to the sale of tobacco, tobacco products, and tobacco paraphernalia, must have a valid business license as required by Title 7 of this Code.

L.A. Cnty. Code § 11.35.055(A).

42.     The provisions above, whether read in a vacuum or within the context of the Los Angeles County Code, impose a licensing requirement through any sales channel.

43.     In connection with the licensing requirements, the Ordinance imposes a categorical prohibition banning the sale of all flavored tobacco products;

"It shall be a violation of this Chapter for a *tobacco retailer/licensee* or its agent(s) or employee(s) to sell or offer for sale or to *possess with the intent to sell* or offer for sale any flavored tobacco product or any component part, or accessory intended to impart, or imparting a characterizing flavor in any form, to any tobacco product or nicotine delivery device, including electronic smoking devices."

L.A. Cnty. Code § 11.35.070(E) (emphasis added).

44.     Even if we ignore the Ordinance's basic provisions and assume online sales would not be subject to enforcement; the Ordinance would still prohibit all flavored tobacco product sales within the county, and even penalize retailers who "*posses*" flavored tobacco products with "*the intent to sell,*" without defining the "intent to sell" anywhere in this Ordinance or within the Los Angeles County Code. Without such necessary definitions, retailers who sell non-flavored tobacco

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

products in-store, but *possess* flavored tobacco products *with the intent to sell* online or out of state, would still be in clear violation of this Ordinance.

45.     As explained in greater detail below, the Ordinance's outright prohibition of all flavored products, and the Ordinance's modification of tobacco product standards relating to the use of characterizing flavors and tobacco products, are exclusively reserved for and preempted by the Family Smoking Prevention and Tobacco Control Act.

V.     **Federal Preemption of Flavored Tobacco Products**

46.     Flavored tobacco products, including flavored e-liquids, are heavily regulated by the FDA.

47.     In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act (the "Act"), (21 U.S.C. §§ 387-387u), the Act vests the FDA with authority to regulate the retail sales, ingredient formulations, and labeling, of tobacco products to protect the public health generally. 21 U.S.C. § 387, *et seq.* Cigarettes, smokeless tobacco, and roll-your-own tobacco products were immediately covered by the FDA's authority when the TCA went into effect. 21 U.S.C. § 387a(b).

48.     In enacting the TCA, Congress granted the FDA regulatory authority over tobacco products and tobacco product standards because the "FDA is the only agency with the right combination of scientific expertise, regulatory experience and public health mission to oversee these [tobacco] products effectively." 155 Cong.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

Rec. H6652 (daily ed. June 12,2009) (statement of Rep. Waxman); <u>see also</u> 155

Cong. Rec. S6021 (daily ed. June 3, 2009) (statement of Sen. Hagan) (the TCA

"grants FDA extremely broad authority to take action that it considers to be in the

interest of public health").

49.     When Congress enacted the TCA, it created one specific tobacco

product standard in the form of a "Special Rule for Cigarettes" in addition to a

series of other tobacco product standards. The Special Rule for Cigarettes prohibits

the use in cigarettes of "characterizing flavors" other than tobacco or menthol

stating that:

> a cigarette or any of its component parts (including the tobacco, filter, or
> paper) shall not contain, as a constituent (including a smoke constituent) or
> additive, an artificial or natural flavor (*other than tobacco or menthol*) or an
> herb or spice, including strawberry, grape, orange, clove, cinnamon,
> pineapple, vanilla, coconut, licorice, cocoa, chocolate, cherry, or coffee, that
> is a characterizing flavor of the tobacco product or tobacco smoke.

21 U.S.C. § 387g(a)(1)(A). (emphasis added).

50.     Menthol cigarettes are an issue exclusively reserved to FDA. Congress

was reluctant to ban all characterizing flavors in all tobacco products because of the

potentially negative public health and economic consequences. Congress excluded

menthol cigarettes from the federal ban, because there was a significant risk of a

black market for them. A report submitted by the Congressional Committee on

Energy and Commerce points out that regulating products like menthol cigarettes, a

widely used product, would pose issues of public health as any such regulation may

lead to heavily addicted smokers suffering from "sudden withdrawal" with

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

"unknown consequences."[20] The report also points out: "the sudden removal of a legal source for such a product without the type of consideration and review that FDA will be able to conduct might unnecessarily increase the illegal black-market risk, which could also pose a health hazard to users."[21] Lastly, the report reiterates that "[t]he law provides FDA the authority to require product changes in current and future tobacco products, such as the reduction or elimination of ingredients, additives, and constituents (including smoke constituents)."[22]

51.     In addition to establishing tobacco product standards, the TCA grants FDA the power to revise the Special Rule for Cigarettes in accordance with the statutes rulemaking procedures. Moreover, the TCA specifically calls upon the FDA to establish a Tobacco Products Scientific Advisory Committee to specifically address the issue of menthol cigarettes.[23] Plus, the Act provides that the FDA is to make a decision on the further regulation of menthol cigarettes.[24]

52.     The standard adopted by Congress reflects a clear congressional decision to limit the ban on characterizing flavors to cigarettes, and not to extend it to other tobacco products.

---

[20] TCA Report H.R., *Committee on Energy and Commerce*, at 38 (March 26, 2009).
[21] *Id*.
[22] *Id*.
[23] *See* 21 U.S.C. § 387g(e)(1)
[24] *See* 21 U.S.C. §§ 387g(e)(3), (f)(3).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

53.     In addition to prohibiting cigarettes with characterizing flavors other than menthol and tobacco, the TCA provides FDA with the authority to ensure the existence of uniform, national tobacco product standards, and preempts state and municipal regulations as follows:

> No State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is *different from, or in addition to*, any requirement under the provisions of this chapter relating to *tobacco product standards*, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.

21 U.S.C. § 387p(a)(2)(A) (emphasis added).

54.     The TCA further expanded the FDA's authority by adding Chapter IX to the federal Food, Drug and Cosmetic Act ("FDCA"), and significantly altering federal regulation of tobacco products by granting FDA the statutory authority to regulate tobacco products, including flavored tobacco products.

55.     On May 10, 2016, the FDA published its Final Rule Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act. 81 FR 28973 ("Final Rule"). The Final Rule brings all tobacco products, including flavored e-liquids and ENDS devices, under the FDA's control and jurisdiction.[25]

56.     Since the Final Rule took effect, all new tobacco products, including flavored tobacco products, have been required to comply with a number of regulatory requirements imposed by the TCA and enforced by the FDA.

---

[25] *See* 81 Fed. Reg. 28,973 – 29,106 (May 10, 2016).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

57.     Under the TCA, tobacco product manufacturers are now required to file with the FDA, all ingredients found in their finished tobacco products 21 U.S.C. § 387d(a)(3), health, toxicological, behavioral, or physiologic effects of their products under 21 U.S.C. § 387d(a)(4), That same year, all U.S. businesses that engaged in the manufacture of tobacco products were required to register their establishment(s) with the FDA and open them to FDA inspection under 21 U.S.C. § 387e(a)(1), (b), (g).

58.     These companies also complied with comprehensive new labeling, packaging and advertising requirements, including the nicotine warning requirement set forth in 21 C.F.R. § 1143.3(a)(1) (2).

59.     As a result of the Final Rule, FDA's authority safeguards the entire tobacco enforcement sequence including: (i) the manufacture and importation of tobacco products; (ii) the wholesale and distribution of tobacco products to retailers; and (iii) the retail sale of tobacco products to consumers.

**VI.     The Flavored Tobacco Products Ordinance is Unconstitutionally Vague**

60.     In essence, L.A. Cnty. Code § 11.35.070(E), criminalizes two types of violations as follows: 1) penalizes retailers who *sell*, or *possess* with the *intent to sell* any "*flavored tobacco product,*" and 2) penalizes any retailer who sells tobacco products without the required licenses beginning May 1, 2020. Violations alleged under this Ordinance are enforced by law enforcement officers and may carry criminal penalties. L.A. Cnty. Code § 11.35.080.

61.     As a basic principle of Due Process, a law must articulate an offense with sufficient precision so citizens can understand what behavior is prohibited and enforcement officers can discern what standards are needed to assess a violation, to keep the law from being applied in an arbitrary and discriminatory manner.

62.     The Ordinance attempts to enforce the following provision: "It shall be a violation of this Chapter for a tobacco retailer/licensee or its agent(s) or employee(s) to *sell* or offer for sale, or to *possess with the intent to sell* or offer for sale, any *flavored tobacco product*." L.A. Cnty. Code § 11.35.070(E) (emphasis added). The term "possess" with the "intent *to sell*" has no definition within the Ordinance or the Los Angeles County Code.

63.     During the September 24, 2019 Board of Supervisors meeting, retailers were instructed that the Ordinance would not regulate online sales.[26] However, the Ordinance mandates that the "sale or distribution" of tobacco products requires the requisite licenses but does not differentiate between in-store, online, or out-of-state sales. L.A. Cnty. Code § 7.83.030.

64.     In accordance with the provisions above, retailers who only sell non-flavored tobacco in person to person transactions, but also "possess" flavored tobacco products with the "intent to sell" exclusively online or out of state, can still be penalized by a law enforcement officer.

---

[26] *The Meeting Transcript of The Los Angeles County Board of Supervisors,* Pg. 81, ¶17

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

65.     To make matters more confusing, retailers are in violation of this Ordinance if the retailers "*possess*" with the "*intent to sell*" any component, part, or accessory "*intended*" to impart, or imparting a characterizing flavor "*in any form*," to any tobacco product or nicotine delivery device, including electronic smoking devices. *Id* (emphasis added).

66.     The Ordinance is also unconstitutionally vague because it allows for arbitrary and discriminatory enforcement. The Ordinance broadly redefines TCA's definition of "Characterizing Flavor" to mean "a taste or aroma, other than the taste or aroma of tobacco, imparted either prior to or during consumption of a tobacco product or any byproduct produced by the tobacco product, including, but not limited to, tastes or aromas relating to menthol, mint, wintergreen, fruit, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, herb, or spice. *Characterizing flavor* includes flavor in any form, mixed with or otherwise added to any tobacco product or nicotine delivery device, including electronic smoking devices" L.A. Cnty. Code § 11.35.020(C).

67.     The LA County Ordinance attempts to broadly regulate the existence of any ingredient, regardless of whether the ingredient imparts a characterizing flavor to the tobacco product.

68.     By its definition, the Ordinance may penalize a retailer for selling or intending to sell a tobacco product that contains virtually any undisclosed ingredient that LA County may decide is prohibited at any point in time.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

69.     It is of utmost importance to note that this Ordinance is designed to penalize retailers who have no control or knowledge of specific ingredients in the products that they sell.

70.     A retailer is not expected to be a connoisseur of tobacco products who can detect hints of flavoring based on smell or taste alone. A retailer cannot be expected to smoke the tobacco product in hopes of determining whether the product contains a characterizing flavor according to LA County standards.

71.     Of course, it is reasonable to expect a retailer to inspect the packaging and label of a tobacco product, and use basic common sense to determine if the product contains any prohibited flavors or ingredients before selling the product to the general public.

72.     However, the Ordinance does not regulate packaging, and manufacturers are not required to identify product flavors on their labels or packaging. As a result, a retailer cannot properly adhere to the Ordinance when the products they purchase do not disclose product ingredients and do not indicate whether or not they contain a prohibited flavor.

73.     The severity of allowing arbitrary and discriminatory enforcement is heightened since enforcement is directed through the Los Angeles County Sheriff's

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

Department who have the authority to impose criminal penalties.[27] L.A. Cnty. Code § 11.35.070(D).

**VII.  The Ordinance Imposes an Unconstitutional System That Deprives Plaintiffs of Due Process**

74.    The Due Process Clause of the Fourteenth Amendment guarantees that no person shall be deprived of life, liberty or property without due process of law.[28]

75.    Plaintiffs maintain property interests in their businesses which they rely on to financially support themselves and their families.

76.    LA County has created a system in which retailers must obtain the necessary retailer licenses in order to continue operating.

77.    However, due to the novel corona virus pandemic, LA County has admitted, via email to CARR members, that they are unable to provide a method in which businesses may apply for and obtain the licenses that they need to continue operating after May 1, 2020. Jacob Decl. ¶16

78.    LA County, through its Ordinance, is imposing a licensing requirement, but is unable to provide a method in which current tobacco retailers may continue doing business after May 1, 2020, thereby intentionally destroying a retailer's entire business, eliminating the jobs of its employees, and financially ruining the businesses without due process protections.

---

[27] *The Meeting Transcript of The Los Angeles County Board of Supervisors,* Pg. 230, ¶ 6.
[28] *U.S. Const. Amend. XIV*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

79. This is untenable under the Fourteenth Amendment.

**VIII. Enforcement of the Flavor Ban Will Require All Retailers in LA County to Shut Down, Resulting in Immediate Closure, Absent Relief**

80. The Ordinance set to take effect on May 1, 2020 will completely devastate the livelihoods of the retailers and their 450 employees.

81. On March 16, 2020, in response to the novel corona virus pandemic, Los Angeles County closed all of its buildings to the public, including the department where retailers may apply for the new Tobacco Business Licenses. Additionally, retailers including ACE, are unable to procure the two requisite licenses online, contrary to information provided on Defendants' website.

82. On March 19, 2020, LA County announced the "Shelter at Home Order" mandating the closure of all tobacco retail stores, as they were deemed non-essential.

83. For LA County tobacco retailers, regular sales during the months of March and April 2020, were undeniably essential to their survival. Tobacco retailers, particularly smoke shops, maintain an inventory comprised of approximately 95 percent in flavored tobacco products. Jacob Decl. ¶ 15. In adherence to the Ordinance, many of these retailers were relying on these final months before the Ordinance enforcement date of May 1, 2020, to sell their inventory of flavored tobacco products. *Id*.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

84.     Plaintiffs: (1) are unable to obtain the two licenses imposed by LA County, since LA County is closed and not expected to re-open until after May 1, 2020; (2) have not received the desperately needed guidance on how to properly conduct business in adherence with the law or how to identify flavored e-liquid products that are not disclosed by the manufacturer; and (3) have been unable to sell or return their current flavored tobacco inventory prior to May 1, 2020 as a result of novel corona virus mandatory closures.

85.     The residual effects of the Ordinance without the aforementioned complications were already expected to have an economically devastating impact on retailers. However, the added complications will ensure that the LA County vapor and flavored tobacco retailers and distributors will never be able to re-open their businesses or retain their employees.

86.     Every business and its employees are counting the days until the novel corona virus Shelter at Home Order is lifted so they may return to work. Unfortunately, tobacco retailers such as ACE and their staff will not receive the same sigh of relief and will be unable to return to work if this Ordinance is not enjoined.

## **FIRST CAUSE OF ACTION**

### **(Supremacy Clause, U.S. Const. art. VI, § 3, Preemption by TCA)**

87.     Plaintiffs re-allege paragraphs 1 through 87 above as if fully set forth herein.

88.     The Supremacy Clause of the United States Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land."[29] Local laws that conflict with federal laws are without effect.

89.     The TCA states that any state or local regulation different from, or in addition to, the tobacco product standards promulgated by the TCA is preempted:

> "No State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this chapter relating to *tobacco product standards*, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products."[30]

90.     The TCA's tobacco product standard states that a: "cigarette or any of its component parts (including the tobacco, filter, or paper) shall not contain, as a constituent (including a smoke constituent) or additive, an artificial or natural flavor (other than tobacco or menthol) … that is a characterizing flavor of the tobacco product or tobacco smoke."[31]

91.     Under the recently enacted Final Rule, the FDA's authority has been enlarged to include all tobacco products, including flavored e-liquids.

92.     The LA Ordinance bans "characterizing flavors," including menthol, in all tobacco products.

---

[29] U.S. Const. art. VI
[30] 21 U.S.C. § 387p(a)(2).
[31] 21 U.S.C. § 387g(a)(1)(A)

93.     The LA County Ordinance falls outside the scope of the savings and preservation clauses and squarely falls within the preemption clause of the TCA.

94.     As applied, the Ordinance's blanket prohibition of menthol in tobacco products is expressly preempted by the TCA.

95.     Congress entrusted the FDA with the sole ability to further regulate the ingredients or general sale of menthol cigarettes.

96.     Through the Final Rule, the FDA's authority was expanded to cover all products containing nicotine, including flavored tobacco products.

97.     The TCA does contain a preservation and savings clause. The savings clause in the TCA provides that the preemption clause "does not apply to requirements relating to the sale, distribution, possession…or use of, tobacco products by individuals of any age." 21 U.S.C. § 387p(a)(2)(B).

98.     The distinction between the preservation clause and savings clause is important to note. The preservation clause subjects any prohibition on the sale to the limits contained in the preemption clause. On the other hand, the savings clause allows states to place *requirements* relating to the sale.

99.     The savings clause in no way allows states to prohibit the sale of tobacco products.

100.    Accordingly, the Ordinance's attempt to prohibit the sale of all flavored tobacco products, and its attempt to redefine and regulate tobacco product standards is preempted by the TCA.

101.    The Ordinance attempts to disrupt the FDA's careful balancing of policy and health interests by prohibiting the sale of all flavored tobacco products; and is usurping the FDA's authority by attempting to regulate and redefine tobacco product standards.

102.    As applied, the Ordinance's blanket prohibition of menthol cigarettes is expressly preempted by the TCA. Congress entrusted the FDA with the sole ability to further regulate the ingredients or general sale of menthol cigarettes.

103.    Through the Final Rule, the FDA's authority was expanded to cover all products containing nicotine, including flavored tobacco products. Accordingly, the Ordinance's attempt to prohibit the sale of all flavored tobacco products, and its attempt to redefine and regulate tobacco product standards is preempted by the TCA.

104.    Accordingly, Plaintiffs respectfully request that, pursuant to 28 U.S.C. § 2201, the Court declare that the TCA preempts the Ordinance, rendering it unenforceable.

## SECOND CAUSE OF ACTION

### (Violation of Due Process – Fourteenth Amendment)

105.    Plaintiffs re-allege paragraphs 1 through 105 above as if fully set forth herein.

106.    The Fourteenth Amendment prohibits states or localities from making or enforcing any law that deprives "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1.

107.    A law is unconstitutionally vague under the Fourteenth Amendment if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement.

108.    The Ordinance is impermissibly vague and standardless in that it is overbroad and lacks certainty in its application to existing and future tobacco licensees in LA County.

109.    The Ordinance is vague in its definition of characterizing flavor, as any ingredient can be deemed to impart a non-tobacco flavor. Retailers lack the ability to verify all ingredients within a tobacco product.

110.    Manufacturers may modify product ingredients without informing the retailer of the changes.

111.    LA County may deem that a product which was initially not prohibited under the Ordinance may become prohibited at any point in time, thus subjecting the retailer to arbitrary enforcement. By its definition, the Ordinance may penalize a retailer for selling or intending to sell a tobacco product that contains virtually any undisclosed ingredient that LA County may decide is prohibited at any point in time.

112.    The Ordinance is impermissibly vague as to the enforcement of all sales channels, as the Board's intent and the LA County website undeniably conflict with the provisions set forth in the Ordinance.

113.    Furthermore, the Ordinance's violation for possession with "intent to sell" flavored tobacco is also impermissibly vague and standardless, since a licensed retailer/distributor can possess flavored tobacco product with "intent to sell" online, or out-of-state, but still be in violation of the Ordinance.

114.    The Ordinance is also impermissibly vague as to the prohibition of flavored tobacco products. However, the Ordinance does not regulate packaging, and manufacturers are not required to identify product flavors on their labels or packaging. As a result, a retailer cannot properly adhere to the Ordinance when the products they purchase do not disclose product ingredients and do not indicate whether or not they contain a prohibited flavor. Jacob Decl. ¶ 13.

115.    Hence, enforcement lies on the retailer who may unknowingly purchase a prohibited tobacco product and be unjustly penalized as a result.

116.    The severity of allowing arbitrary and discriminatory enforcement is heightened since enforcement is directed through the Los Angeles County Sheriff's Department, with the authority to impose criminal penalties.[32] L.A. Cnty. Code § 11.35.070(D).

---

[32] *The Meeting Transcript of The Los Angeles County Board of Supervisors,* Pg. 230, ¶ 6.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

117.    Lastly, LA County is imposing a licensing requirement, but is unable to provide a method in which current tobacco retailers may continue doing business after May 1, 2020. Therefore, LA County is creating a situation whereby it is impossible for Plaintiffs and other tobacco retailers to apply for a license and stay in business after May 1, 2020.

118.    Thus, the Ordinance is unenforceable under the Due Process Clause of the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant and ask the Court for the following relief:

1.    Pursuant to 28 U.S.C. § 2201, declaring that under the Supremacy Clause of the United States Constitution, the TCA preempts the Ordinance, rendering it unenforceable; and that the Ordinance is invalid under the Due Process Clause of the Fourteenth Amendment of the Constitution.

2.    Pursuant to Federal Rule of Civil Procedure 65, enjoining the County of Los Angeles from enforcing the Ordinance; and

3.    Granting such other and further relief as this Court may deem just and proper.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

DATED: May 1, 2020                JAWLAKIAN LAW GROUP, A.P.C.


                                  By: /s/ George K. Jawlakian
                                      George K. Jawlakian
                                  Attorneys for Plaintiffs CA SMOKE
                                  AND VAPE ASSOCIATION, and
                                  ACE SMOKE SHOP

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF